IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


JAMES E. CARTER,

      Petitioner,

vs.

                                CASE NO. 5:04cv382-RH/WCS

JAMES CROSBY,

      Respondent.

_____/


## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by James E. Carter pursuant to

28 U.S.C. § 2254.  Doc. 1.  Petitioner challenges his conviction after a jury trial for lewd

and lascivious molestation of a child less than 12 years of age by a person 18 years of

age or older in violation of FLA. STAT. § 800.04(5)(b).  The conviction was in the Circuit

Court of the Fourteenth Judicial Circuit, in and for Bay County, Florida, case number 00-

0159G.  Respondent filed an answer, doc. 4, and the state record, doc. 5, and Petitioner

filed a traverse, doc. 15.  Respondent concedes that the petition was timely filed.


**Trial Evidence**

The child, who was 9 years old at trial, testified that he spent a lot of time with Petitioner, who he called his Uncle James.  *Id.*, p. 30.  He said that Petitioner touched his "spot," later explained to have meant his penis.  *Id.* and p. 41.  He said that Petitioner had done this before, but he could not remember when.  *Id.*, pp. 31-32.  He also said that Petitioner had "stuck his spot up [his] butt," but he could not remember how long that had been going on.  *Id.*, p. 32.

Tanya Hopkins, the child's mother, said that Petitioner was "a very close friend of the family."  *Id.*, p. 36.  She said that from the time that her son was two and one-half to three years old, Petitioner "always came to the birthday parties, brought birthday presents, was always there for holidays, took [her son] fishing, played outside with him in his pool."  *Id.*, p. 37.  Prior to January 11, 2000, she said that her son liked to spend time with Petitioner.  *Id.*  She never heard her son complaining about Petitioner or about not wanting to spend time with Petitioner.  *Id.*

Ms. Hopkins testified that in November of the preceding year, Petitioner began picking her son up from school and would usually keep him for 30 minutes to two hours.  *Id.*, p. 38.  On Thursday, January 13, 2000, she, her husband, and her son's grandmother discussed having her son spend "the holiday" at Petitioner's house.  *Id.*, p. 39.  Her son heard this, became very upset and scared, and said he did not want to go.  *Id.*, p. 40.  Ms. Hopkins said that she asked him why, and he said he could not tell her, but could tell his grandmother.  *Id.*  After he talked with his grandmother, the Sheriff's office was contacted.  *Id.*  Since that time, she noticed that her son cried a lot, had bad nightmares, and stayed upset.  *Id.*, p. 41.  She said that she had not observed this behavior before January 11th.  *Id.*  She said that in counseling, her son said that "this

had been going on" with Petitioner since kindergarten.  *Id.*, p. 42.  She said that her son

said that the reason he did not tell anyone is that Petitioner "told him if he ever told

anybody he would kill him."  *Id.*, p. 46.

The State introduced evidence that Petitioner confessed to having fondled the

child's penis for about 5 minutes on one occasion.  That evidence will be discussed in

greater detail ahead.

Dr. James Mitchell, a pediatrician, testified for the defense that he examined the

child and found no physical evidence that would prove or disprove "fondling or attempts

or actual anal intercourse."  *Id.*, p. 81.  He said that he examined the child on January

19th, eight days after the fondling incident.  *Id.*, p. 82.  He said it was normal not to find

evidence of sexual abuse or anal intercourse 4 or 5 days after the incident, and he

would not expect to find any evidence 8 days later if it had been a one time incident.

*Id.*, pp. 82-83.  He thought it possible to see evidence of anal penetration if it occurred

more than once, but there was less than a 50% chance of such evidence.  *Id.*, p. 84.

Petitioner testified that he had known the child's family for about 11 years.  *Id.*, p.

85.  He said he was the child's godfather and he thought of him as his own son.  *Id.*, p.

86.  On January 11, 2000, he said he and his girlfriend, Jennifer, picked the child up

from school.  *Id.*  He said that when they got home, they opened the child's school

behavior report, and he said that when the child saw him reading the behavior report,

the child "went ballistic on me, told me to put it down, it wasn't none of my business and

I told him to quit talking to me that way, that I'm supposed to do this."  *Id.*, p. 87.  He

said he spanked the child, and this was the first time he had done so.  *Id.*  He said that

the child "collapsed on the floor, I had to pick him up, put him on the couch and he tried

to run out the door, said he was going to run home." *Id.*, pp. 87-88.  Petitioner put him

back on the couch and told him that if he got up again, he was going to spank him

again. *Id.*, p. 88.  Petitioner said the child cried and fell asleep.  *Id.*  He said he was

asleep "right there until his mom came and picked him up."  *Id.*

Petitioner denied that he fondled the child.  He denied having anal intercourse

with him, or doing anything to threaten the child.  *Id.*, pp. 90-91.  On cross examination,

he again denied that he fondled the child, and said that he lied on the audiotape

recording of his confession.  *Id.*, p. 99.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have

exhausted their claims in state court.  28 U.S.C. §§ 2254(b)(1), (c)."  O'Sullivan v.

Boerckel,  526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999).  In order to

properly exhaust state remedies, "state prisoners must give the state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of the

State's established appellate review process."  526 U.S. at 845, 119 S.Ct. at 1732.  To

properly exhaust remedies as required by § 2254(b), "the federal claim must be fairly

presented to the state courts."  Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512,

30 L.Ed.2d 438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130

L.Ed.2d 865 (1995) (*citing* Picard).

If a claim was not fairly presented but is procedurally barred from further state

court review,[1] Petitioner must demonstrate cause for the default and actual prejudice, *or*

---

[1] Procedurally defaulted claims are considered technically exhausted because
state court remedies no longer remain "available."  The court therefore refers to "fairly

demonstrate that the constitutional violation has probably resulted in conviction of an innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).  Ineffective assistance of counsel may constitute cause for a procedural default, but the claim of ineffective assistance of counsel as cause for the default must first be properly exhausted in state court.  Murray v. Carrier, 477 U.S. 478, 488-89, 106 S.Ct. 2639, 2645-46, 91 L.Ed.2d 397 (1986).

For claims which were properly exhausted and adjudicated in state court, this court's review is limited.  "[A] determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).  Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(2); 321 F.3d at 1322 (citing the statute).  Section 2254(d)(2) is satisfied "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record."  Lomholt v. Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was

presented" claims as having been *properly* exhausted, to distinguish them from claims exhausted by procedural default.  *See* O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States."  § 2254(d)(1).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

independent meanings.  Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495,

1519-1520, 146  L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843,

1850, 152 L.Ed.2d 914 (2002) (citing Williams).   "[C]learly established Federal law, as

determined by the Supreme Court of the United States," refers only to holdings of the

Supreme Court, but decisions of lower federal courts may be considered to the extent

that they demonstrate how those courts applied Supreme Court  precedent.  Hawkins v.

Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by [the
> Supreme] Court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable facts.
> Under the "unreasonable application" clause, a federal habeas court may
> grant the writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.

The law governing ineffective assistance of counsel claims was clearly

established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,

2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520;

Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland,

Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or

omissions of counsel that are alleged not to have been the result of reasonable

professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim,

"counsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment."  466 U.S. at

690, 104 S.Ct. at 2066.  Petitioner has a heavy burden to establish the deficient

performance prong of Strickland, by showing that "no competent counsel would have

taken the action that his counsel did take."  Fugate v. Head, 261 F.3d 1206, 1217 (11th

Cir. 2001) (citation omitted).  There are no rigid requirements, or absolute duty to

investigate a particular line of defense.  *Id.*

> Indeed, "[c]onsidering the realities of the courtroom, more is not always
> better.  Stacking defenses can hurt a case.  Good advocacy requires
> 'winnowing out' some arguments, witnesses, evidence, and so on, to
> stress others."

261 F.3d at 121 (citations omitted).

For prejudice, Petitioner must show "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the

outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis,

"there is no reason . . . to approach the inquiry in the same order or even to address

both components of the inquiry if the defendant makes an insufficient showing on one."

466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim

on the ground of lack of sufficient prejudice, which we expect will often be so, that

course should be followed."  *Id.*

If the state court identifies and applies the framework of Strickland in assessing an ineffective assistance claim, its adjudication does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently. Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (citing Williams).  "[T]he most important point is that an unreasonable application of federal law is different from an incorrect application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Grounds One through Four**

Petitioner contends in Ground One that his confession was involuntary because it was induced by a promise from the interrogator that Petitioner would receive counseling in exchange for an admission of guilt, and was threatened that he would serve a life sentence if he did not confess.  Respondent argues that the claim is procedurally defaulted because it was never raised as a claim before the state court.

Petitioner contends that the cause for his procedural default is ineffective assistance of counsel, and he raises this claim in Grounds Two, Three, and Four. Ground Two alleges that counsel was ineffective for failing to file a motion to suppress the confession as involuntary.  Ground Three claims that trial counsel was ineffective for failing to object that the confession was involuntary.  Ground Four argues that appellate

counsel was ineffective for failing to raise the voluntariness of the confession on direct appeal.

The findings and reasoning in support of the state court's ruling on the ineffective assistance of counsel claim are not easily discernible.  A hearing was held on Petitioner's Rule 3.850 motion.  Doc. 5, Ex. F, R. 189-222 (transcript of Rule 3.850 hearing).  Petitioner asked for a lawyer, but the request was denied.  *Id.*, R. 189.

Petitioner's trial attorney, Shannon Saunders, testified at the Rule 3.850 hearing that prior to trial, he was "just out of law school," so he discussed the issue of the voluntariness of Petitioner's confession with several other lawyers, including Walter Smith, the chief assistant public defender.  He said that Smith did not think there was enough evidence of coercion to support a successful motion to suppress Petitioner's confession.  *Id.*, R. 199-200.  Saunders said that he himself reached this same conclusion.  R. 210-211.[2]  Saunders decided, however, to attack the confession at trial.  *Id.*, R. 200.  He also decided to argue to the jury that Petitioner falsely confessed to fondling the child because of promises made and fear engendered during the interrogation.  *Id.*, R. 213-214.

Saunders testified that prior to the statement being admitted into evidence at trial, he moved to have the statement excluded.  *Id.*, R. 200.  Circumstantial evidence in the record indicates that this is so.  At the beginning of the trial, there was a bench conference which was not transcribed.  Doc. 5, Ex. A (trial transcript), p. 46.  Whatever was said at this unrecorded bench conference prompted a proffer of evidence from

---

[2] Since he did challenge the admission of the confession at trial, this is presumed to mean that he elected not to file a pretrial motion to suppress.

Investigator Bruening, who conducted the interrogation of Petitioner.  This proffer

occurred with the jury excused.  *Id.*  It is reasonably inferred from the substance of

Bruening's testimony that this proffer was in response to a motion to exclude the

confession as an involuntary confession made by defense counsel during the bench

conference.  There is no other reason that the proffered evidence had any relevance.

This conclusion is further bolstered by other evidence in this record.  When the

proffer ended, the trial court turned to Petitioner's attorney and said: "You have no other

argument to make?"  *Id.*, p. 51.  There are no substantive arguments in the transcript,

so the reference to an "argument" by Petitioner's attorney to preclude the admission of

the confession into evidence must have been to an argument made during the

unrecorded bench conference.  Likewise, when the audiotape of the confession was

introduced into evidence and played for the jury, the court said that the evidence was

admitted "subject to the prior objection."  *Id.*, p. 60.  Finally, at the Rule 3.850 hearing,

the attorney representing the State asked the court to take judicial notice that the

prosecutor in the case, Mark Graham, had made a note of citations to four judicial

decisions in the case file, which apparently were in the file as a basis to argue against

the objection to the confession.  R. 201.  The cases cited at the Rule 3.850 hearing all

concern the voluntariness of a confession.[3]

The trial court rejected the ineffective assistance of counsel claim concerning the

voluntariness of the confession.  Doc. 5, Ex. F, p. 187.  While that written order does not

---

[3] DeCastro [Castro in the transcript] v. State, 359 So. 2d 551 (Fla. 3d DCA 1978);
State v. Beck, 390 So. 2d 748 [348 in the transcript] (Fla. 3d DCA 1980); Wade v. State,
204 So. 2d 235 (Fla. 2d DCA 1967); Dailey v. State, 501 So. 2d 15 (Fla. 2d DCA 1987).

set forth the basis for the ruling, the court orally issued its ruling at the conclusion of the

evidentiary hearing.  The court found that Petitioner's counsel "did, in fact, attempt to

prevent the statement from being presented to the jury.  That decision was overruled."

*Id.*, R. 220, citing pages 47-50 of the trial transcript.

In summary, the trial court's finding that Petitioner's attorney objected that the

confession was involuntary and inadmissible is supported by the record evidence.  This

finding of fact, therefore, is binding upon this court.  This disposes of Ground Three

adversely against Petitioner.  Petitioner's counsel did preserve the issue of the

voluntariness of the confession for appeal by his objection at trial.

The trial court did not, however, address the question of whether Petitioner's

attorney *effectively* argued the issue of the voluntariness of the confession, which

seems to be the premise of Ground Two, liberally construed.  The trial court did not

discuss the voluntariness of the confession at all, except to say that the judge who

presided at the trial had ruled against Petitioner.  Thus, there is no state court ruling on

the federal issue of ineffective assistance of counsel as to which this court must defer.

Since that is the case, this court must consider in detail the merits of the underlying

issue, whether the confession was voluntary.

At trial during the proffer, Investigator Tony Bruening testified that he went to

Petitioner's house and asked him to come to the Sheriff's Office to talk about allegations

that he had "messed with a child."  Doc. 5, Ex. A (trial transcript), p. 48.  Bruening said

that when they got to the Sheriff's interview room, he advised Petitioner of his "rights"

(*Miranda* rights).  *Id.*  He said that Petitioner acknowledged that he understood his rights

and "wanted to give me a statement on what had happened."  *Id.*  Bruening said that

"from that point on I told him that at any time he could stop, tell me to go fly a kit[e], whatever he wanted to do."  *Id.*, p. 49.  Bruening was asked whether the issue of help was discussed and he said:

> I told him that if he did indeed fondle [the child] that he needed some type of help or some type of counseling and he agreed that he did need some kind of counseling.  And then that's when he told me that he only done this one time.  I told him I would pass all this information on to the state attorney's office.

*Id.*

Bruening said that Petitioner appeared to know what he was doing and he knew who Bruening was.  *Id.*, pp. 49-50.  Bruening was asked if any promises were made to Petitioner, and he said: "No.  Only thing is, you know, I agreed that I would pass the information on to get him some type of counseling if he did, indeed, mess with this kid." *Id.*, p. 50.  Then the following took place on cross examination by Petitioner's attorney, Shannon Saunders:

> Q.    You never made any promises to James?
>
> A.    No, the only thing I made, I don't know if you would call it a promise is if he needed some help I would see about getting him some.
>
> Q.    Do you think he could have inferred that statement to mean that you were not going to charge him?
>
> A.    No.
>
> Q.    Never coerced him?
>
> A.    No.

*Id.*, pp. 50-51.

The court ruled the confession to have been voluntary and admissible, and the jury was then brought back in.  *Id.*, p. 51.  With the jury in the courtroom, Investigator Bruening testified essentially in the same manner as during the proffer.  He said that Petitioner came with him to the Bay County Sheriff's Office, they went into the interview room, and he advised him of his *Miranda* rights.  *Id.*, pp. 54-56.  Bruening again said he told Petitioner he could stop talking at any time, and tell Bruening to "go fly a kite."  *Id.*, p. 56.  He said that Petitioner was free to "get up and leave at any time."  *Id.*  Bruening said that he told Petitioner that "if he did indeed fondle [the child] in anyway [sic] that he needed some help and some counseling and he agreed that he did need some counseling and he told me that he had only played with [the child's] penis one time."  *Id.*, p. 57.  When asked if there were any promises, Bruening said that he would not call it a promise, but "I did tell him that if he wanted some help or needed some help I would try to, I would pass it on to the state attorney's office to get him some type of counseling."  *Id.*, p. 58.  Bruening said he had done that.  *Id.*  Bruening also testified that "I told him if he did indeed fondle the child that he would be arrested."  *Id.*  Bruening denied telling Petitioner that he would not go to jail if he talked to him.  *Id.*  He said he told Petitioner he was free to go or could stop talking at any time.  *Id.*

The audiotape was then played to the jury.  *Id.*, p. 60.  The following exchange took place at the beginning of the tape:

> Q.     Okay, you understand that before we started all I asked of
>        you was to tell me the truth that I was going to try to get you
>        some counseling, okay?
>
> A.     (Inaudible)

> Q.   I'd get you some help if needed.  Okay.  There's been some
> allegations made against you by [the child].  This kid's 8
> years old and goes by [the child's first name]. . . .

*Id.*, p. 62.  Petitioner then admitted that he fondled the child's penis while sitting on a

couch.  *Id.*, pp. 64-65.  He said he only did this one time for about 5 minutes.  *Id.*, p. 66.

He denied telling the child that he would kill him, but admitted that he asked the child to

"please don't tell nobody . . . ."  *Id.*, p. 66.

On cross examination, Bruening admitted that before Petitioner confessed, he

told him that he had "enough on him, enough information to charge him with this

offense."  *Id.*, p. 72.  He said he told Petitioner he needed to do the right thing, to tell the

truth.  *Id.*  Bruening was asked whether he told Petitioner that if he would admit the

allegations, "you would get him some help *and you wouldn't charge him*," and Bruening

answered that "[h]e was told that if he did indeed do this *he would go to jail*, he would be

arrested . . . [a]nd I would get him some counseling."  *Id.*, p. 73 (emphasis added).

Petitioner testified at trial that Bruening told him that there were "some

allegations made against you that you have fondled this child . . . ."  *Id.*, p. 89.

Petitioner said that Bruening then said:

> [H]e went in, into detail, told me what the child was claiming, I put my
> hands in his pants, I fondled him and he says that if you did this, he said I
> will get you come counseling.  But he said I got enough probable cause to
> go ahead and arrest and charge you and he got, this is capital sexual
> battery, well, not capital but sexual battery and you could spend the rest of
> your life behind bars.

*Id.*  Petitioner said he was scared when he was told this.  *Id.*  Petitioner said that when

they got to the interrogation room, they sat down, he was handed a waiver of rights

form,

and from what he told me in the car I was already knew [sic] I was going to talk that way, I could go ahead and get my counseling, I wouldn't be going to jail.  That's the impression he gave me. . . .  Impression was that if I went ahead and admitted to this that I could get my counseling, go on about my life.  But if I denied it that I would go to jail and spent the rest of my life behind bars.

*Id.*, pp. 89-90.

On cross examination, Petitioner admitted that he knew he did not have to say anything to Investigator Bruening, that what he said could be used against him court, and that he had a right to talk with a lawyer.  *Id.*, pp. 92-94.  Petitioner said that he just "repeated the information given to me is what I said happened."  *Id.*, p. 96.  He said: "Yeah, everything that he told me prior to turning the tape on that he told I supposedly done I said I did it."  *Id.*, p. 97.  When asked whether he confessed because he wanted counseling, Petitioner said: "I didn't want counseling.  I didn't want to go to jail for the rest of my life."  *Id.*, p. 97.

"The Supreme Court has held – and it is therefore clearly established – that the government cannot introduce a suspect's statement taken without the presence of an attorney without first showing that the suspect made a voluntary, knowing, and intelligent waiver of his right to counsel."  Hart v. Attorney General of State of Florida, 323 F.3d 884, 891 (11th Cir.), *cert. denied*, 540 U.S. 1069 (2003) (citation omitted).

Likewise, it is clearly established from holdings of the Supreme Court that the inquiry into whether a waiver was voluntary, knowing, and intelligent is twofold:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to

> abandon it.  Only if the "totality of the circumstances
> surrounding the interrogation" reveal both an uncoerced
> choice and the requisite level of comprehension may a court
> properly conclude that the Miranda rights have been waived.

> *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d
> 410 (1986) (*quoting Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560,
> 2572, 61 L.Ed.2d 197 (1979)).

323 F.3d at 892.

In Florida it has been held that "[w]here there is an express quid pro quo, i.e., a

promise of protection from prosecution for cooperation, the promise of leniency alone is

sufficient to render a confession or inculpatory statement involuntary."  Walker v. State,

771 So.2d 573, 575 (Fla. 1st DCA 2000) (citations omitted).  However, where there is

no *express* quid pro quo, the statement is not rendered involuntary:

> Statements suggesting leniency are only objectionable if they establish an
> express quid pro quo bargain for the confession.  *State v. Moore*, 530 So.
> 2d 349 (Fla. 2d  DCA 1988).  Before taking his confession, Edgerton
> specifically told Bruno that the police would not make any promises to
> either Bruno or his son, and if he wanted to give a statement, it was of his
> own accord.  There was no police overreaching, and the fact that Bruno's
> confession was motivated in part by concern over the welfare of his son
> does not provide a basis for suppressing the confession.

Bruno v. State, 574 So. 2d 76, 79-80 (Fla. 1991), *cert. denied*, 502 U.S. 834 (1992).

Federal cases are similar.  In United States v. Barbour, 70 F.3d 580 (11th Cir.

1995), *cert. denied*, 517 U.S. 1147 (1996), federal agents identified themselves as law

enforcement agents and advised the defendant that they wanted to talk with him about

his plan to kill the President; they "also told him that they would help him receive mental

health treatment."  70 F.3d at 583.  The agents were "well-mannered, courteous and

cooperative throughout the entire interview."  *Id.*, at 584.  The court found that the

confession was voluntary, reasoning:

Thus, the fact that Barbour was suffering severe depression does not
render his statements involuntary unless the agents took advantage of his
mental illness.  In this case, the agents did no more than offer to help
Barbour obtain medical assistance, which he in fact received.  The district
court found that the agents' promise to help Barbour receive mental health
treatment was not an assurance that the entire matter would not be
treated as a criminal issue.  This conclusion is supported by the testimony
of Agent McKenna, Barbour's own statement that he was aware that the
agents were investigating a charge that he had attempted to kill the
President, and his knowledge that this attempt was a crime.  Finally,
Barbour described the agents as extremely polite and very courteous.
Absent any evidence of psychological or physical coercion on the part of
the agents, there is no basis for declaring Barbour's statements and
consent to search involuntary.

*Id.*, at 585.

In Oats v. Singletary, 141 F.3d 1018 (11th Cir. 1998), *cert. denied*, 527 U.S. 1008

(1999), the interrogating officer said:

We as police officers can't promise you anything other than we will . . . like
I told you before, we'll talk to everybody in the system about getting help
for you, and we'll talk to the State Attorney's Office about your bond; I'll
promise you that.

141 F.3d at 1027 n. 23.  The court held that the officers did not promise leniency and

made no statements that would render the confession involuntary.  *Id*.

In Green v. Scully, 850 F.2d 894 (2d Cir. 1988), the interrogator told the

defendant he faced the electric chair, that he had sufficient evidence to prove that he

had committed the murders, repeatedly offered psychiatric help, but also said that

defendant was going to jail.  850 F.2d at 896.  The court concluded that the offer of

psychiatric help, in context, did not make the confession involuntary:

Although Detective Hazel did offer psychiatric help, nothing he said could
be construed as holding out the hope of leniency in the courts or a shorter
sentence.  Even were this offer of help somehow to be interpreted as
inducing Green to have such a hope, that belief would be dissipated by
Hazel's advice that Green should not think he was going to escape

responsibility for what he did and telling Green that he would have "to go to jail."

*Id.*, at 903.  The court also noted, however, that after giving the confession, the

defendant had said:  "to be honest with you, what made me sit down and tell you what I

told you was not for you to help me."  *Id.*  The court pointed out that the defendant had

"expressed concern that without his confession, the police might not have enough

evidence (allaying to some extent the 'chicanery' because it apparently was not the

crucial motivating factor) and he would 'get off.' "  *Id.*  This was important to the court's

conclusion that the confession was voluntary.  The court noted: "Then, he added, 'I am

going to go out there and do it to somebody else. . . .  [I]t might be my mother.' "  850

F.2d at 903.  The court reasoned:

> This statement convinces us that the scare tactics, false representation as
> to the evidence, good cop/bad cop routine, and whatever hopes were
> instilled from the promises or fears from the reference to "the chair"
> considered together did not overbear Green's will and bring about his
> confession.  He confessed – as he candidly admitted – because he was
> afraid that what he had done to the victims in a blackout would be
> something he was going to do to his own family – maybe even his mother.

850 F.2d at 903-904.

Miller v. Fenton, 796 F.2d 598 (3d Cir.),[4] *cert. denied*, 479 U.S. 989 (1986), is

perhaps the most extreme case of "good guy" interrogation, that is, an attempt to

convince the target of the inquiry that the interrogator is only interested in "helping" him.

---

[4] The case was on remand from Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88
L.Ed.2d 405 (1985) (holding that the ultimate determination by a federal court as to
whether a state confession was voluntary is an issue of federal law).  The Hart decision,
however, sets forth the standard now that this court must follow in light of the enactment
of the Antiterrorism and Effective Death Penalty Act (the AEDPA).

In that case, summarizing a very lengthy exposition of what actually happened, the

court said that the interrogator's

> major theme throughout the interrogation was that whoever had
> committed such a heinous crime had mental problems and was
> desperately in need of psychological treatment.  From early in the
> interview, Detective Boyce led Miller to understand that he believed that
> Miller had committed the crime and that Miller now needed a friend to
> whom he could unburden himself.  *The Detective stated several times that
> Miller was not a criminal who should be punished*, but a sick individual
> who should receive help.  He assured Miller that he (Detective Boyce) was
> sincerely understanding and that he wished to help him with his problem.

796 F.2d at 602 (emphasis added).  The court (a two member majority) noted that

psychological ploys "may play a part in the suspect's decision to confess, but so long as

that decision is a product of the suspect's own balancing of competing considerations,

the confession is voluntary."  796 F.2d at 605.  The question, said the court, was

whether the detective's statements to the defendant "were so manipulative or coercive

that they deprived Miller of his ability to make an unconstrained, autonomous decision

to confess."  *Id.*

The court pointed out that Miller was 32 years of age and of normal intelligence.

*Id.*, at 606.  He had had experience in the criminal justice system and had three felony

convictions.  *Id.*  The interrogation lasted less than an hour.  *Id.*

The court acknowledged that "the promises of psychiatric help might have

suggested to Miller that he would be treated, rather than prosecuted."  *Id.*, at 608.

However, "it does not matter that the accused confessed because of the promise, so

long as the promise did not overbear his will."  *Id.*, *citing* Hutto v. Ross, 429 U.S. 28, 30,

97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (per curiam).  The court reasoned that Miller

knew his statements could be used against him in a criminal prosecution because he

had been given the *Miranda* warning, and thus he knew that if he confessed he could be

prosecuted.  *Id.*, at 609.  Thus, the detective's "words of comfort" "would have had to

overcome Miller's initial belief that the state intended to prosecute him and to sentence

him to jail if convicted in order to render Miller's confession involuntary."  *Id.*  The court

found that "[a]t no time did Detective Boyce state that Miller would not be prosecuted or

that he could successfully avail himself of the insanity defense."  *Id.*  "Detective Boyce

never stated that anyone but he thought that Miller was 'not a criminal,' nor did he state

that he had any authority to affect the charges brought against Miller."  *Id.*, at 610.  The

court found the promises of psychiatric help more problematic, but reasoned that a

"distinction can be drawn, however, between promises of leniency in the imminent

criminal proceedings against the defendant and promises of help with some collateral

problem."  *Id.*, at 610.  The court concluded that the confession was voluntary.

On the other hand, in United States v. Rogers, 906 F.2d 189 (5th Cir.  1990), the

defendant had possession of stolen firearms.  He was told by deputy sheriffs that he

would not be prosecuted if he cooperated in locating the firearms.  906 F.2d at 189.

Later, he was asked to speak to federal law enforcement officers at the sheriff's office.

The officers did not tell defendant that they were investigating the offense of possession

of a firearm as a convicted felon, and the defendant assumed that their inquiry was that

this was only a follow-up of the county investigation.  *Id.*  The court held that under

these circumstances, the confession was not voluntary.  The case is distinguishable

from the preceding cases, however, because in Rogers, the investigators promised the

defendant that he would not be prosecuted.  The real issue in the case was whether the

defendant reasonably thought that the promise also included immunity from federal prosecution.

In the case at bar, Petitioner was 30 years old at the time of his confession.[5] There is no indication that he was of low intelligence.  He was fully advised of his constitutional rights, including the right to a lawyer and to remain silent, if he wished, and he acknowledged that he understood these rights.  The interrogation was not lengthy.  He was not deprived of sleep, water, food, or other necessities of life, and there was no physical coercion.  Petitioner knew that he faced a charge that might carry a sentence of life in prison.  The interview was at the Sheriff's office.  Bruening said he told Petitioner that if he in fact fondled the child, he would be arrested (or go to jail).  There was no promise that if Petitioner confessed, he would not be prosecuted.  There is little dispute that Bruening also told Petitioner that if he confessed, he (Bruening) would try to see that he received mental health treatment.  Considering all of these factors together, the confession was voluntary.  It was not improperly induced by a promise that Petitioner would receive mental health care.

Since the confession was voluntary, prejudice to the outcome has not been shown, and the claims of ineffective assistance of trial and appellate counsel are without merit.  Grounds One through Four do not afford any relief.

**Grounds Five and Six**

Petitioner asserts that his attorney was ineffective because he failed to "secure" Jennifer Bozeman, Darren Hopkins, and John Bozeman as a witnesses on his behalf at

---

[5] Doc. 5, Ex. A (trial transcript), p. 65.

trial.  He contends that the three witnesses were at his house the entire two hours that

the child was at his house, and he argues that they would have testified that they did not

see him fondle the child.  Respondent agrees that state court remedies have been

exhausted as to this claim.

The state court orally ruled that Petitioner's attorney tried to find two "alibi"

witnesses, but they could not be located.  Doc. 5, Ex. F (Rule 3.850 hearing transcript),

R. 220-221.   The court also found that Petitioner had failed to make a showing that a

good faith effort was not made to attempt to find these witnesses.  *Id.*, R. 221.

At the Rule 3.850 hearing, Petitioner's attorney testified that he could recall that

Petitioner brought to his attention two "alibi" witnesses, Jennifer and John Bozeman.

Doc. 5, Ex. F, R. 196.  He did not recall that Petitioner mentioned Darren Hopkins.  *Id.*

Counsel said he spoke with Jennifer Bozeman "on a number of occasions," and

said that "[h]er attitude was that she did not want to get involved, that she, basically that

she did not want to get involved.  She stated that, to leave her alone and she had

nothing to say was basically her attitude."  *Id.*, r. 196-197.  Counsel said that he could

not get Jennifer Bozeman to answer questions on the telephone.  *Id.*, R. 197.  Counsel

said he did issue a deposition subpoena and deposed her.  *Id.*  After that, he thought

that both Jennifer and John Bozeman "were making every effort to attempt to avoid us

contacting them."  *Id.*  After the deposition, Petitioner's attorney determined that Jennifer

Bozeman "provided absolutely no exculpatory evidence whatsoever and, in fact, I think

she would have done more harm than good if we would have been able to find her and

subpoena her to trial."  *Id.*, R. 198.

Counsel said that nonetheless, he tried to get Mr. Jordan to serve subpoenas for trial, but that was not successful.  *Id.*  To the best of his recollection, he thought he discussed this problem with Petitioner and he thought he remembered that Petitioner had said "let's go ahead and move forward to trial," that he did not want to delay the trial.  *Id.*

Ernest Jordan testified that he was the Chief Investigator for the Public Defender of the Fourteenth Judicial Circuit.  *Id.*, R. 217.  He said that Petitioner's attorney, Saunders, asked him to try to locate Jennifer and John Bozeman to serve subpoenas. *Id.*  He went to the address that he had and asked a neighbor and was told that they no longer lived at that address.  *Id.*, R. 217-218.

Attached to the petition are excerpts from the deposition of Jennifer Bozeman. Doc. 1, Ex. A.[6]  Ms. Bozeman said she was "dating James," which must mean Petitioner.  *Id.*, R. 141.  She said that she was at Petitioner's residence "the whole week before it happened," and was there on January 11, 2000.  *Id.*, R. 140.  She said that neither Petitioner nor the child left her sight that, and she denied that Petitioner touched the child in "any wrongful way."  *Id.*, R. 141.  She said that Petitioner spanked the child, and the child got onto the couch and went to sleep.  *Id.*, R. 143.  She said that she, Petitioner, the child's uncle, Darren Hopkins, and her father, John Bozeman, were all there and all four of them were on the couch with the child.  *Id.*, R. 141, 143-144.  Her own baby was there, too.  *Id.*, R. 142.  According to Vickie L. Glasenapp, who was not there, Jennifer Bozeman's child was asleep at the other end of the couch.  Doc. 1, Ex. B

---

[6] This is also Doc. 5, Ex. F, R. 140-144, which are pp. 4, 5, 11-13 of the deposition.

(affidavit).  When asked why she was sure that all of this happened on January 11th,

Ms. Bozeman said "because I'm there twenty-four seven almost."  Doc. 5, Ex. F, R. 144.

Then she said she was there half of the time.  *Id.*

Petitioner has not provided any evidence as to what either Darren Hopkins or

John Bozeman would have said if called as witnesses.  A defendant's conclusory

allegations about the testimony of uncalled witnesses are insufficient to state a claim of

ineffective assistance of counsel.  *See* Aldrich v. Wainwright, 777 F.2d 630, 636-37

(11th Cir.1985), *cert. denied*, 479 U.S. 918 (1986); Bolder v. Armontrout, 921 F.2d

1359, 1363-1364 (8th Cir.1990), *cert. denied*, 502 U.S. 850 (1991); United States v.

Vargas, 920 F.2d 167, 169-170 (2d Cir.1990), *cert. denied*, 502 U.S. 826 (1991).

Petitioner's attorney subpoenaed Jennifer Bozeman for a deposition, but was

unable to locate her again for the trial.  As the trial court found, there is no evidence that

he could have done anything more to find her.

Moreover, the scene painted by the testimony of Jennifer Bozeman is rather

strained.  She states that four adults were sitting on a couch for several hours with a

sleeping eight year old boy taking up space at one end, and apparently a sleeping baby

taking up space at the other.  Even if it was an unusually large couch, which has not

been shown, it is improbable that four adults would have sat upon it for several hours

without moving about.  Petitioner's attorney found Ms. Bozeman's testimony to have

been lacking in credibility, and even from the face of the cold record, that seems to be

an accurate judgment call.

Consequently, neither attorney error nor prejudice to the outcome has been

shown.  Thus, the state court's adjudication of the merits of the federal claim has not

been shown to have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).  Grounds Five and Six are without merit.

**Ground Seven**

Petitioner contends that he was denied a full and fair Rule 3.850 hearing and was unfairly denied appointment of counsel at that hearing.  He contends that he was entitled to appointment of counsel under state law.  He also contends that he was not given enough time to prepare for the hearing.  Respondent addresses the merits of this claim.

There is no right to counsel in state post-conviction proceedings.  Jones v. Crosby, 137 F.3d 1279, 1280 (11th Cir.), *cert. denied*, 523 U.S. 1041 (1998), *citing*, Murray v. Giarratano, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989).  "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."  28 U.S.C. § 2254(i).  Further, a claim that the post-conviction proceedings were unfair or marred by procedural error does not state a federal claim. Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir.1987) (state court's failure to hold a hearing on Rule 3.850 motion and failure to attach relevant portions of the record to its order were unrelated to the cause of detention, and did not state a basis for § 2254 relief); *see also* Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir. 1999) ("habeas corpus relief is not available to correct alleged errors in state habeas proceedings," citing

Spradley, and cases from the Fourth, Fifth, Sixth, Eighth and Ninth Circuits).  Ground

Seven is without merit.

**Ground Eight**

Petitioner contends that his confession was introduced into evidence without

independent evidence of *corpus delicti*, and contends that this violated due process.

Respondent argues that the claim is procedurally defaulted because, although the claim

was raised on direct appeal with a citation to Amendments 5, 6, and 14 of the federal

constitution, no federal argument was presented.

It is more efficient to address the merits of this claim.[7]  "As a predicate to the

admission of a confession into evidence, Florida law generally requires that the *corpus*

*delicti* be established independently of the confession."  State v. Dionne, 814 So.2d

1087, 1090-1091 (Fla. 5th DCA 2002), *review dismissed*, 865 So. 2d 1258 (2004).[8]

This is a state law evidentiary rule.  Absent a showing of a denial of a fundamentally fair

trial, violation of a state law rule of evidence is not a basis for relief in this court.  Engle

v. Isaac, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982); Wallace v.

Turner, 695 F.2d 545, 548 (11th Cir. 1983) (procedural rule); Branan v. Booth, 861 F.2d

1507, 1508 (11th Cir. 1989) (sentencing guidelines); Carrizales v. Wainwright, 699 F.2d

---

[7] "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

[8] A month before Petitioner's trial, FLA. STAT. § 92.565(3) (effective June 5, 2000) eliminated the need to prove *corpus delicti* where, *inter alia*, sexual abuse is alleged in violation of § 800.04, the state is unable to show the existence of each element of the crime, and the confession is trustworthy.  Whether the victim was under the age of 12 is a relevant factor in the former inquiry.  State v. Dionne held that this new law could be applied to an offense which occurred before it was enacted.

1053, 1054-1055 (11th Cir. 1987) (jury instruction).  Thus, two circuits have held that state rules governing *corpus delicti* do not implicate the federal constitution.  Lucas v. Johnson, 132 F.3d 1069, 1078 (5th Cir.), *cert. dismissed*, 524 U.S. 965 (1998) ; Evans v. Luebbers, 371 F.3d 438, 442-443 (8th Cir. 2004), *cert. denied*, 125 S.Ct. 902 (2005). Petitioner has made no showing of the denial of a fundamentally fair trial.  Therefore, Ground Eight is without merit.

**Ground Nine**

Petitioner contends that his trial was fundamentally unfair because unauthorized reading material was taken into the jury room.  He also notes that he was not present in the courtroom when the court rejected the jury's request for a copy of the trial transcript, and contends that this was a due process violation.  Finally, Petitioner points out that the trial court brought the jury back into the courtroom to see how they were doing, and he contends that this tainted the jury's deliberations.  Respondent makes the same procedural default argument as made with respect to Ground Eight and also addresses the merits.  Again, it is simpler to address the merits rather than the procedural default issue.

A juror took a novel into the jury room.  Doc. 5, Ex. A, p. 130 (trial transcript). The trial judge sent the bailiff in with a note and retrieved the book or books.  *Id.*, p. 131.

"Fundamental to the administration of justice is a fair and impartial trial free from extrinsic influence and based solely upon the evidence offered at trial."  United States v. De La Vega, 913 F.2d 861, 870 (11th Cir. 1990), *cert.* denied, 500 U.S. 916 (1991), citing, Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965).

> When jurors consider extrinsic evidence, we require a new trial if the
> evidence poses a reasonable possibility of prejudice to the defendant.
> Prejudice is not presumed.  The defendant has the burden of
> demonstrating prejudice by a preponderance of credible evidence.

*Id*.  In that case, the court affirmed the trial court's ruling that the possession by one

juror of a book (WHAT YOU NEED TO KNOW FOR JURY DUTY by Godfrey Lehman) was

harmless error beyond a reasonable doubt.

The rule is the same in Florida, although Florida places the burden of proof upon

the State.  When extraneous materials go into the jury room during deliberations,

"prejudice will be assumed in the form of a rebuttable presumption, and the burden is on

the Government to demonstrate the harmlessness of any breach to the defendant."

State v. Hamilton, 574 So. 2d 124, 129 (Fla. 1991).  In that case, automobile magazines

went into the jury room.  *Id*.  The court held that these magazines were "clearly

irrelevant" to the factual and legal issues of the case and the "potential for prejudice"

was slight or nonexistent.  *Id*.

Petitioner has the burden of proof as to his federal claim.  He has not shown that

the novel or novels could have harmed the deliberations of the jurors in any way.  Only

one juror had a book or books, and there has been no showing that anything in these

materials was relevant in any way to the jury's deliberations.  This aspect of Ground

Nine is without merit.

Petitioner's contention that he was not in the courtroom when the trial court first

denied the jury's request for a copy of the transcript is probably incorrect.  The transcript

shows that the court came back into session at 1:35 p.m., but it does not indicate

whether the Petitioner was present.  Doc. 5, Ex. A, p. 131.  The jury was brought into

the courtroom and several jurors asked for a copy of the testimony of the officer and the

Petitioner.  *Id.*, pp. 131-132.  The jurors were excused so that the court could discuss

the question with "the attorneys."  *Id.*, p. 133.  Another recess was taken, and the court

resumed at 3:20 p.m.  *Id.*, p. 134.  Again, there is no mention of the presence of

Petitioner.  The jury was brought in.  *Id.*  The jury was again taken out, and the trial

court asked Petitioner a question and he answered it.  *Id.*, pp. 135-136.  Thus, Petitioner

was present during the second period that the jury had been brought back into the

courtroom, although the trial transcript made no official note of his presence.

Consequently, he was probably there during the first period.

It will be assumed for argument, however, that Petitioner was not present in the

courtroom during the first interlude with the jury.  During the first interlude, the court

denied the request for transcripts because both attorneys urged that result.  *Id.*, p. 133.

When the jury was brought back into the courtroom a second time, the trial court

granted their request and sent the transcripts into the jury room.  *Id.*, p. 135.  The court

specifically asked Petitioner whether that was acceptable and Petitioner agreed that it

was.  *Id.*, pp. 135-136.

"The Supreme Court has held that 'a defendant is guaranteed the right to be

present at any stage of the criminal proceeding that is critical to its outcome if his

presence would contribute to the fairness of the procedure.' "  <u>Diaz v. Secretary for the

Dept. of Corrections</u>, 402 F.3d 1136, 1141-1142 (11th Cir. 1987), *cert. denied*, 484 U.S.

1079 (1988), *quoting*, <u>Kentucky v. Stincer</u>, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96

L.Ed.2d 631 (1987).  "So far as the Fourteenth Amendment is concerned, the presence

of a defendant is a condition of due process to the extent that a fair and just hearing

would be thwarted by his absence, and to that extent only."  Snyder v. Com. of Mass.,

291 U.S. 97, 107-108, 54 S.Ct. 330, 333, 78 LED. 674 (1934), *overruled on other*

*grounds*, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).  In Diaz,

the defendant was absent, *inter alia*, when the court and the prosecution discussed the

length of closing arguments.  402 F.3d at 1144.  The defendant was representing

himself at that time.  *Id.*, at 1142.  However, the trial court reserved ruling and set the

length of closing arguments when the defendant was again present.  The court found

"any flaw" was cured under these circumstances.  *Id.*, at 1144.

     The same is true in the case at bar.  Petitioner was present on the second

occasion, when the court changed its mind and sent the transcripts to the jury.  Any

flaw, if there was one, was cured.  This second aspect of Ground Nine is without merit.

     The final issue is whether Petitioner has shown that he was denied a

fundamentally fair trial because the trial court twice brought the jury back to inquire as to

how they were proceeding in their deliberations.  He contends that the trial court

showed impatience with the jury, and thus tainted their deliberations.

     The first instance is the following:

                         (Upon resuming at 1:35 p.m.)

THE COURT:          Let's see, Mr. Redyke, the jury gave you a comment
                    that they felt they were unable to reach a decision?

THE BAILIFF:        That's what they said.

MR. GRAHAM:         Wanted to know if they could eat some lunch?

THE COURT:          Let's me bring them out, see if that's what they want,
                    if they want lunch we will make arrangements for
                    lunch.  If they say they can't make a decision I'll give
                    them an Allen charge, if that is agreeable.

| | |
|---|---|
| | Bring them out, see what they have to say. |
| | (Jury is in the courtroom) |
| THE COURT: | Have a seat, if you would.  Has the jury been able to reach a decision? |
| JUROR ONE: | No, it hasn't, Your Honor. |
| THE COURT: | Did I hear some comment that you were interested in some food? |
| JUROR ONE: | Yes. |
| THE COURT: | We can make arrangements for food.  Is there anything else that you wanted to ask me? |
| JUROR ONE: | Is it possible to get a copy of some of the testimony? |

Doc. 5, Ex. A, pp. 131-132.

The Court denied the request for transcripts and arranged for food to be brought to the jury room.  *Id.*, pp. 132-134.  With the jury out, Petitioner's attorney said that he thought that the jury simply wanted to hear more testimony, and it was "not really that they can't reach a verdict."  *Id.*, p. 134.  The trial court said:

> I haven't heard them say that, that's the reason I didn't want to read them anything until they expressed an – sometimes if you say that it can be considered coercive so that's the reason I said nothing to them.  And if you wish I'll wait until we get the menus and the whole thing before I send them this note.

*Id.*  The note told the jury to rely upon their own recollection about the testimony of the witnesses.  *Id.*, p. 133.

The second encounter with the jury was about two hours later, at 3:20 p.m.  *Id.*, p. 134.  The following occurred:

| | |
|---|---|
| THE COURT: | Bring the jury out and see what they have to say. |

(Jury is in the courtroom)

THE COURT:            Have you reached a verdict?

JUROR ONE:           No.

THE COURT:            Come on out, folks.  Be seated, please.

                     Members of the jury, have you reached a verdict?

JUROR ONE:           No, Your Honor.

THE COURT:            I know that you had requested earlier some of the
                     testimony.  Would that be of assistance to you?  Do
                     you think you can have further discussions?

JUROR ONE:           We think it would help.

THE COURT:            Then counsel agrees that we do that?

Mr. SAUNDERS:        No objection, Judge.

MR. GRAHAM:          No objection as long as we give them the complete
                     testimony.

THE COURT:            Ms. Diltz will have to go whip it out of her computer.  It
                     will take a few minutes and we will give you the
                     transcript as soon as they are completed.  You get
                     fed?

JUROR ONE:           Yes.

                     (Jury out of the courtroom)

*Id.*, pp. 134-135.  After the jury left the courtroom, the trial court said to the Petitioner:

"Mr. Carter, I just wanted to make sure that you agreed that these transcripts go back to

the jury?"  *Id.*, p. 135.  Petitioner said:  "Yes, Ma'am."  *Id.*, p. 136.  The transcript was

then handed to the jury through the jury room door.  *Id.*

"The applicable standard of review is whether, under the totality of the circumstances, the district court's instructions were coercive and whether this coercion 'so infected the entire trial that the resulting conviction violated due process.' " United States v. Polar, 369 F.3d 1248, 1254 (11th Cir. 2004), *quoting*, United States v. Brokemond, 959 F.2d 206, 208  (11th Cir. 1992).  In Polar, the jury had sent the trial court three separate notes complaining of an uncooperative juror; the third note asked that he be dismissed.  369 F.3d at 1253.  The court questioned the juror, instructed him to follow his instructions and the law, and asked him if he would do that.  *Id.*, at 1254.  The court found no error: "Nothing in the district court's questioning and instructions suggested that a particular outcome was either desired or required, nor was it 'inherently coercive.' " *Id.*

The same is true here to an even greater degree.  The trial court was trying to determine whether to provide the transcript for the jury, as the jury had requested, and to provide food for the jury in the event they needed more time for deliberations.  While the court was also concerned about the jury's deliberations, it was concerned only to the extent that it wished to provide those things needed to give the jury the opportunity to deliberate.  The court was very careful to accommodate the jurors' needs in aid of deliberation rather than to admonish them for failing to agree upon a verdict.  For all of these reasons, Ground Nine is without merit.

**Grounds Ten and Eleven**

In Ground Ten, Petitioner states that the trial court closed the trial to the public when the victim testified, and failed to reopen the courtroom during the remaining

proceedings.  He asserts that as a consequence, his trial was "in secret."  He argues

this violated due process and his right to a public trial.

In Ground Eleven, Petitioner asserts that his trial and appellate counsel were

ineffective for failing to object to the closure of the courtroom.

As to Ground Ten, Respondent argues that there was no objection to the closure

of the courtroom when it initially occurred, citing doc. 5, Ex. A, p. 28.  This is correct.

The prosecutor asked that the courtroom be "secured," and the trial court said "Don't let

anyone in the courtroom, please."  *Id.*  Petitioner's trial counsel said:  "Just for the

record I would like to renew *my original – .*"  *Id.*, emphasis added.  The court cut counsel

off, stating, "That's fine.  *It's on the record.*"  *Id.*, emphasis added.  The objection made

by counsel earlier *on the record* was that the child not be allowed to have the victim's

advocate and a stuffed animal while he testified.  *Id.*, p. 4.

It is plain from this exchange that Petitioner's counsel was simply renewing his

"original" objection to allowing the child to be accompanied by the victim's advocate and

a stuffed animal.  Thus, Petitioner has not shown that his attorney made any objection

to the closure of the courtroom.

Petitioner did not raise the issue of the closure of the courtroom on direct appeal

either.  Doc. 5, Ex. B (initial brief on appeal).  Since exhaustion requires one full round

of state court review, including a direct appeal, this claim was procedurally defaulted

both at the trial and appellate levels.  Petitioner must show cause for the procedural

defaults and prejudice to the outcome before the court may address the merits of the

claim.

As to Ground Eleven, Respondent argues that Petitioner did not raise a claim of ineffective assistance of his *trial* counsel for failing to object to closure of the courtroom in his Rule 3.850 motion.  This is correct.  This particular claim of ineffective assistance of trial counsel was not presented in the Rule 3.850 motion.  Doc. 5, Ex. F, R. 78-132.

Petitioner argues in response that he presented the claim of ineffectiveness of trial counsel in his petition for writ of habeas corpus in the First District Court of Appeal. Doc. 15, p. 27, citing doc. 5, Ex. L.  This contention is not supported by the record.  The only claim of ineffectiveness raised in that petition was the ineffectiveness of appellate counsel for, among other things, failing to appeal the issue of closure of the courtroom. Ex. L.  Thus, state court remedies as to Ground Eleven were procedurally defaulted as to the claim of ineffective assistance of trial counsel.  Since Petitioner only exhausted state court remedies as to the claim of ineffective assistance of appellate counsel, and has not shown cause or prejudice as to the defaulted ineffective assistance of trial counsel claim, the only claim that is properly before this court is the effectiveness of appellate counsel claim.

Appellate counsel is not required to raise every nonfrivolous issue.  Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  463 U.S. at 751-752, 103 S.Ct. at 3313.  To determine the prejudice, the court reviews the merits of the omitted or poorly presented claim, and will find prejudice only where the claim would have a reasonable probability of success on appeal.  Heath v. Jones, 941 F.2d 1126, 1136 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077 (1992).

It is unclear whether the courtroom remained closed after the child testified.  The

courtroom was apparently "secured" when the child began to testify.  Doc. 5, Ex. A, p.

28.  When the next witness was called (Tanya Hopkins), the court reporter made no

notation one way or the other whether the courtroom was still closed.  *Id.*, p. 34.

The lack of notation in this transcript is relatively meaningless, as the court

reporter did not record other important information either, that is, whether Petitioner was

present or what was said at bench conferences.  It is unreasonable to presume that the

courtroom remained closed from this silent record.

There is no need for an evidentiary hearing.  Petitioner has come forward with no

evidence that some member of the public attempted to enter the courtroom and was

turned away by the closure order.  Nor has Petitioner presented any other evidence

from anyone competent to testify as to whether the courtroom remained closed for the

rest of the trial.  Thus, the only closure on this record is that the trial was partially closed

for the testimony of the child, and it is only that closure that would have been the subject

of an appeal.

Since Petitioner's trial counsel made no objection to the partial closure of the

courtroom, the question would have been reviewed on direct appeal only for

"fundamental error."  Jones v. State. 883 So. 2d 369 (Fla. 3d DCA 2004).  Florida courts

uniformly hold that a partial closure without objection for the testimony of a child victim

in a sexual abuse case is not fundamental error.  Jones, 883 So. 2d at 371-372; Alvarez

v. State, 827 So. 2d 269, 274 (Fla. 4th DCA 2002) (*en banc*), *review denied*, 845 So. 2d

887 (2003).  Thus, had Petitioner's appellate lawyer attempted to raise the issue on

direct appeal, the claim would have failed because Petitioner's trial lawyer had not made a contemporaneous objection.

There was no federal constitutional infirmity either because there was no objection at trial.  "The most basic rights of criminal defendants are . . . subject to waiver."  Peretz v. United States, 501 U.S. 923, 936, 111 S.Ct. 2661, 2669, 115 L.Ed.2d 808 (1991), *citing*, *inter alia*, Levine v. United States, 362 U.S. 610, 619, 80 S.Ct. 1038, 1044, 4 L.Ed.2d 989 (1960) generally for the proposition that "failure to object to closing of courtroom is waiver of right to public trial."

For these reasons, cause for the procedural default of Ground Ten has not been shown, and the court cannot reach the merits of that ground.  Cause has not been shown for the default of the claim of ineffective assistance of trial counsel for failing to object to the partial closure of the trial, and the court cannot reach the merits of that aspect of Ground Eleven.  The claim of ineffective assistance of appellate counsel is without merit for lack of a showing of attorney error or prejudice to the outcome.

**Conclusion**

Accordingly, it is **RECOMMENDED** that petition for writ of habeas corpus filed by

James E. Carter pursuant to 28 U.S.C. § 2254 challenging his conviction for lewd and

lascivious molestation of a child less than 12 years of age by a person 18 years of age

or older in violation of FLA. STAT. § 800.04(5)(b), in the Circuit Court of the Fourteenth

Judicial Circuit, in and for Bay County, Florida, case number 00-0159G, be **DENIED**

**WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on November 1, 2005.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**